**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION**

TOMISLAV PROTICH,

    Plaintiff,

v.                                                                Case no.

HIVELOCITY LLC,

    Defendant.

_____.

**COMPLAINT FOR VIOLATIONS OF THE FAMILY MEDICAL LEAVE
ACT (FMLA) AND JURY DEMAND**

Plaintiff, Tomislav Protich, herein files this complaint and sues Defendant, Hivelocity LLC, for violations of the Family Medical Leave Act (FLMA), and alleges and says as follows:

**PARTIES**

1.      Plaintiff Tomislav Protich is a resident of Florida.

2.      Defendant Hivelocity LLC (hereinafter Hivelocity), is a Florida corporation with a principal place of business in Tampa, Florida. Its principal place of business is located at 8010 Woodland Center Blvd, Suite 700, Tampa, FL 33614, and its Tax ID# is 36-4484945. The Defendant may be served through its designated registered agent Corporation Service Company at 1201 Hays Street, Tallahassee, FL 32301.

## JURISDICTION AND VENUE

3.     This Court has original subject matter jurisdiction over this action as this case arises under federal law, specifically the Family and Medical Leave Act, 29 U.S.C. §§ 2601 et seq.

4.     This Court has personal jurisdiction over Defendant Hivelocity LLC because Defendant is a Florida corporation with a principal place of business in Tampa, Florida, which is located within the Middle District of Florida.

5.     Venue is proper in this Court as the Defendant resides and conducts continuous business in this judicial district from its corporate office where substantial events giving rise to the claims occurred. At all times material, Plaintiff was employed by Defendant and worked for Defendant in Tampa, Florida, and the adverse employment actions, including Plaintiff's termination, occurred in Tampa, Florida, within the Middle District of Florida.

## GENERAL FACTS

6.     Plaintiff Tomislav Protich was employed by Defendant Hivelocity LLC as a Senior Cloud Engineer for over 13 years, having been hired on August 20, 2012.

7.     Throughout his tenure with Defendant, Plaintiff received excellent performance reviews.

8.    In 2023, Plaintiff received a performance review rating of 4.33 out of 5.0, designated as "Greatly Exceeds Expectations."

9.    In 2024, Plaintiff received a performance review rating of 4.05 out of 5.0, designated as "Exceeds Expectations."

10.    Prior to February 2025, Plaintiff had zero disciplinary actions in his entire 13-year employment history with Defendant.

11.    On February 17, 2025, Plaintiff was involved in a head-on motor vehicle collision.

12.    He was then out of work for protected FMLA leave of approximately 9 days, consecutively, and then intermittently over the next 6 months associated with his serious health condition and injuries from this collision, and which at such times rendered him disabled.

13.    Thereafter, Protich required leave for his injuries intermittently, on or about the following dates: 03/19/2025; 03/20/2025 — back-to-back days; 04/22/2025; 04/30/2025; 05/14/2025; 05/15/2025 — back-to-back days again; 05/29/2025; 07/02/2025; and 08/05/2025.

14.    After his initial 9-day disablement period, including when Plaintiff was hospitalized, Plaintiff returned to full time work.

15.    As a result of the collision, Plaintiff suffered a traumatic brain injury (TBI). This injury and resulting condition qualifies as a disability under the terms of the ADA and as a handicap under the Florida Civil Rights Act.

16.    On February 28, 2025, Plaintiff reported the accident and his injuries to Defendant when he was able to communicate after hospitalization.

17.    Plaintiff's healthcare provider, Kenna Prins, APRN of Ethos Health Group, diagnosed Plaintiff with a TBI then prescribed medical restrictions and accommodations.

18.    Defendant failed to offer Plaintiff FMLA protection for any of this time he missed, nor FMLA coverage going forward for the intermittent days.

19.    On August 5, 2025, Plaintiff's treating physician completed an FMLA WH 380-E Certification of Health Care Provider form which outlined the necessity for work restrictions and need for intermittent leave.

20.    On October 6, 2025, associated with another WH 380-E form, Plaintiff provided Defendant with a medical note from his healthcare provider requesting accommodations including no on-call duties, no overtime, no extended hours, and no overnight shifts.

21.    The medical restrictions were necessary because Plaintiff's TBI symptoms, including cognitive difficulties, headaches, light sensitivity, and fatigue were worsened by irregular schedules and circadian disruption.

22. On October 2, 2025, Defendant issued Plaintiff his first Performance Improvement Plan (PIP) in his entire 13-year career with the company.

23. The October 2, 2025 PIP was issued just days after the Plaintiff requested medical accommodations.

24. On October 9, 2025, the Defendant's Chief Operating Officer ordered the Plaintiff to work an overnight shift with less than 24 hours' notice, directly conflicting with Plaintiff's documented medical restrictions.

25. On October 10, 2025, Defendant issued the Plaintiff a second PIP, only eight days after the first.

26. On October 20, 2025, Defendant even then issued Plaintiff a third PIP, creating a pattern of three PIPs issued within 18 days.

27. On October 21, 2025, Plaintiff filed a formal internal complaint with Defendant alleging unlawful retaliation and failure to accommodate his disability.

28. On November 6, 2025, Defendant's Chief Legal Officer, Ross Woodham, sent a letter to Plaintiff's healthcare provider containing leading questions designed to undermine Plaintiff's medical restrictions.

29. On November 11, 2025, Plaintiff requested additional FMLA leave from Defendant because of his serious health condition.

30. On November 17, 2025, Defendant issued a Notice of FMLA Eligibility and Rights confirming that Plaintiff was, in fact, eligible for FMLA leave.

31.    On November 18, 2025, Defendant issued Plaintiff a supplemental Notice of FMLA Eligibility and Rights.

32.    Plaintiff's healthcare provider completed a WH-380-E Certification of Health Care Provider for Employee's Serious Health Condition form on December 9, 2025.

33.    The WH-380-E form documented Plaintiff's serious health condition (TBI) and confirmed that Plaintiff required accommodations and was unable to perform certain job functions, specifically on-call duties, and overnight shifts.

34.    On December 15, 2025, Plaintiff filed an inquiry with the Equal Employment Opportunity Commission (EEOC Inquiry #511-2026-01019) regarding Defendant's conduct.

35.    On December 15, 2025, the Defendant's Chief Legal Officer responded to Plaintiff's EEOC inquiry by accusing Plaintiff of "delaying tactics" and threatening "next steps."

36.    On December 19, 2025, Plaintiff's healthcare provider issued a corrected letter explicitly stating that overnight shifts were not appropriate for Plaintiff and clarifying that a prior response dated November 17, 2025, was based on misleading questions from the Defendant's Chief Legal Officer.

37.    On January 9, 2026, the Defendant's Chief Legal Officer sent the Plaintiff a letter purporting to conclude the interactive accommodation process.

38. The January 9, 2026, letter presented Plaintiff with a binary ultimatum: resume on-call duties OR work routine overnight shifts, with termination threatened if Plaintiff could not accept either option.

39. The January 9, 2026, letter stated: "on-call duty is an essential function of the role" and "If you cannot accept either option, we will have no choice but to terminate your employment."

40. The January 9, 2026, letter did not offer any alternative accommodations or engage in any genuine interactive process to identify reasonable accommodations.

41. Plaintiff requested and was approved for FMLA leave for February 4-6, 2026.

42. On February 3, 2026, the Defendant issued the Plaintiff a final written warning.

43. On February 6, 2026, while Plaintiff was on approved FMLA leave, Defendant terminated Plaintiff's employment.

44. The termination letter was sent by the Defendant's Chief Legal Officer, Ross Woodham, and stated that the Plaintiff's employment would end effective February 6, 2026.

45. In communications regarding Plaintiff's termination, the Defendant's Chief Legal Officer explicitly stated: "Your requests for FMLA leave and medical

accommodations are being used to avoid work and accountability for delivering tasks."

46. Defendant's Chief Legal Officer also stated: "releasing you from on-call work is not a reasonable accommodation."

47. These statements directly linked Plaintiff's termination to his requests for FMLA leave and medical accommodations.

48. Defendant offered Plaintiff a severance payment of $3,948 (equivalent to one paycheck) in exchange for a broad release of all claims, including claims under the FMLA and Americans with Disabilities Act.

49. At the time of his termination, Plaintiff's annual salary was $102,648.

50. As a result of the Defendant's unlawful termination, the Plaintiff has suffered lost wages, lost employment benefits, emotional distress, humiliation, anxiety, and other damages.

## LEGAL CLAIMS

### COUNT I - INTERFERENCE WITH FMLA RIGHTS:  FMLA 25 CFR PART 25, 29, USC CHAPTER 28

51. Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 50 as if fully set forth herein.

52. Plaintiff was an eligible employee under the FMLA.

53.     Plaintiff worked for Defendant for over 13 years, worked more than 1,250 hours in the 12 months preceding his FMLA leave request, and worked at a location where Defendant employed 50 or more employees within 75 miles.

54.     Defendant confirmed Plaintiff's FMLA eligibility in written notices dated November 17, 2025, and November 18, 2025.

55.     Defendant employed 50 or more employees, making it a covered employer under the FMLA.

56.     The Plaintiff was entitled to FMLA leave.

57.     Plaintiff suffered a traumatic brain injury from a motor vehicle collision on February 17, 2025, constituting a serious health condition under the FMLA.

58.     Plaintiff's healthcare provider completed a WH-380-E certification form on December 9, 2025, documenting Plaintiff's serious health condition and certifying that Plaintiff required FMLA leave.

59.     The certification documented that Plaintiff's condition constituted a chronic condition requiring treatment visits at least twice per year and that Plaintiff was unable to perform certain job functions.

60.     The Plaintiff gave the Defendant notice of his need for FMLA leave.

61.     Plaintiff requested FMLA leave on November 11, 2025.

62.     Defendant acknowledged receipt of Plaintiff's FMLA leave request and issued FMLA eligibility notices on November 17, 2025, and November 18, 2025.

63. Defendant approved Plaintiff's FMLA leave for February 4-6, 2026.

64. Defendant interfered with, restrained, and denied Plaintiff's exercise of his FMLA rights.

65. On February 6, 2026, while Plaintiff was on approved FMLA leave running from February 4 through February 6, 2026, Defendant terminated Plaintiff's employment.

66. The termination occurred during the period of approved FMLA leave, thereby denying Plaintiff the FMLA protection to which he was entitled.

67. By terminating Plaintiff while he was on approved FMLA leave, Defendant interfered with Plaintiff's right to take FMLA leave.

68. Plaintiff suffered damages as a result of Defendant's interference with his FMLA rights.

69. As a direct and proximate result of Defendant's termination of Plaintiff's employment, Plaintiff has suffered and continues to suffer lost wages, lost employment benefits, emotional distress, and other damages.

70. Plaintiff's annual salary at the time of termination was $102,648.

71. As a direct and proximate result of the unlawful actions of Defendant, Plaintiff has lost and continues to lose wages and employment benefits as a result of Defendant's unlawful conduct. Those damages continue to accrue.

72.    Plaintiff has suffered pain and suffering, mental anguish, and humiliation as a result of Defendant's termination of his employment and interference with his FMLA rights.

73.    Plaintiff was forced to retain legal representation to vindicate his federally protected rights.

74.    The FMLA provides for recovery of double the sum in wages as liquidated damages, plus entitlement to recovery of reasonable attorney's fees and costs of this action among other damages.

## COUNT II - RETALIATION FOR FMLA LEAVE REQUESTS AND PROTECTED ACTIVITY IN VIOLATION OF THE FMLA 25 CFR PART 25, 29, USC CHAPTER 28

75.    Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 50 as if fully set forth herein.

76.    Plaintiff engaged in protected activity under the FMLA.

77.    On November 11, 2025, Plaintiff requested FMLA leave from the Defendant.

78.    Plaintiff again requested and was approved for FMLA leave for February 4-6, 2026.

79.    Each of these activities constituted protected activity under the FMLA.

80.    Defendant had knowledge of Plaintiff's protected activities.

81. Defendant had actual knowledge of Plaintiff's accommodation requests, as the requests were submitted to Defendant's management and human resources personnel.

82. Defendant acknowledged Plaintiff's FMLA leave request in written notices dated November 17, 2025, and November 18, 2025.

83. Defendant's Chief Legal Officer responded to Plaintiff's EEOC inquiry on December 15, 2025.

84. Defendant approved Plaintiff's FMLA leave for February 4-6, 2026, demonstrating knowledge of Plaintiff's exercise of FMLA rights.

85. Plaintiff suffered adverse employment actions.

86. On October 2, 2025, Defendant issued Plaintiff his first Performance Improvement Plan in his entire 13-year career with Defendant.

87. On October 9, 2025, Defendant forced Plaintiff to work an overnight shift with less than 24 hours' notice, directly conflicting with Plaintiff's documented medical restrictions.

88. On October 10, 2025, the Defendant issued the Plaintiff a second Performance Improvement Plan, only eight days after the first.

89. On October 20, 2025, the Defendant issued the Plaintiff a third Performance Improvement Plan, creating a pattern of three PIPs issued within 18 days.

90. On February 3, 2026, the Defendant issued the Plaintiff a final written warning.

91. On February 6, 2026, the Defendant terminated the Plaintiff's employment.

92. Each of these actions constituted an adverse employment action.

93. Plaintiff's protected activity was a contributing factor in the adverse employment actions.

94. The temporal proximity between Plaintiff's protected activities and Defendant's adverse actions establishes that the protected activity was a contributing factor in the adverse actions.

95. Several Performance Improvement Plans were issued after Plaintiff's first requested FMLA protected leave despite the Plaintiff having zero disciplinary actions in 13 years of employment with the Defendant.

96. Plaintiff was terminated on February 6, 2026, while on approved FMLA leave that ran from February 4 through February 6, 2026.

97. Defendant's Chief Legal Officer provided direct evidence of retaliatory intent in written communications.

98. In the termination email and in a letter dated January 9, 2026, the Defendant's Chief Legal Officer explicitly stated: "Your requests for FMLA leave

and medical accommodations are being used to avoid work and accountability for delivering tasks."

99. Defendant's Chief Legal Officer also stated: "releasing you from on-call work is not a reasonable accommodation."

100. These statements directly link Plaintiff's termination to Plaintiff's FMLA leave requests and accommodation requests, constituting direct evidence of retaliatory motive.

101. After the Plaintiff filed an EEOC inquiry on December 15, 2025, the Defendant's Chief Legal Officer responded by accusing Plaintiff of "delaying tactics" and threatening "next steps," demonstrating retaliation for engaging in protected activity.

102. The dramatic change in Defendant's treatment of Plaintiff – from zero disciplinary actions in 13 years to three several Performance Improvement Plans occurred after Plaintiff began requesting accommodations and FMLA leave.

103. Defendant cannot demonstrate that it would have taken the same adverse actions absent Plaintiff's protected activity.

104. Plaintiff's performance reviews were consistently high, with ratings of 4.33 out of 5.0 in 2023 and 4.05 out of 5.0 in 2024.

105. The sudden and dramatic change in the Defendant's treatment of the Plaintiff occurred only after the Plaintiff engaged in protected activity.

106. Defendant's Chief Legal Officer's explicit statements linking the termination to Plaintiff's FMLA leave requests and accommodation requests demonstrate that the protected activity was the motivating factor for the adverse actions.

107. Defendant cannot show that it would have terminated Plaintiff absent his FMLA leave requests and accommodation requests.

108. Plaintiff has suffered and continues to suffer damages as a result of Defendant's retaliation.

109. As a direct and proximate result of Defendant's retaliatory termination of Plaintiff's employment, Plaintiff has suffered and continues to suffer lost wages, lost employment benefits, emotional distress, humiliation, anxiety, and other damages.

110. Plaintiff's annual salary at the time of termination was $102,648.

111. Plaintiff has lost and continues to lose wages and employment benefits as a result of Defendant's unlawful retaliation.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and against Defendant as follows:

a)      Damages against Defendant equal to the total sum of wages, salary, employment benefits, and other compensation denied or lost to Plaintiff by

reason of Defendant's violations, including back pay from February 6, 2026, to the present, pursuant to the FMLA;

b)    Interest on the amount of lost wages and compensation calculated at the prevailing rate, pursuant to the FMLA;

c)    Liquidated damages against Defendant equal to the sum of the lost wages, compensation, and interest described in paragraphs A and B above, pursuant to the FMLA;

d)    Front pay against Defendant for future lost earnings, or in the alternative, reinstatement to Plaintiff's former position as Senior Cloud Engineer with Defendant.

e)    Compensatory damages against Defendant for lost employment benefits, including health insurance, retirement contributions, and other fringe benefits.

f)    Compensatory damages against Defendant for emotional distress, humiliation, anxiety, and other non-economic harm suffered by Plaintiff as a result of Defendant's unlawful conduct.

g)    Reasonable attorney's fees and costs of this action against Defendant, pursuant to the FMLA;

h)    Prejudgment interest on all damages from the date of termination to the date of judgment.

i) Post judgment interest as provided by law.

j) Such other and further equitable relief as the Court deems just and proper.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury on all issues so triable.

Dated April 6, 2026.

Respectfully submitted:

*/s/Mitchell L. Feldman, Esq.*
Mitchell L. Feldman, Esq.
Florida Bar No.: 0080349
FELDMAN LEGAL GROUP
12610 Race Track Road, Suite 225
Tampa, FL 33626
Phone: 813-639-9366
Fax: 813-639-9376
Mfeldman@flandgatrialattorneys.com
Lead Attorney for Plaintiff